UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

v.                                                    **OPINION AND ORDER**

JAMIE ORSINI and NICHOLAS ORSINI,                     23-CR-00402 (PMH)

                              Defendants.
------------------------------------------------------------X

PHILIP M. HALPERN, United States District Judge:

Pending before the Court are the post-trial motions filed by Jamie Orsini and Nicholas Orsini (together, "Defendants"), requesting that the Court enter an order setting aside the jury's guilty verdict pursuant to Federal Rule of Criminal Procedure 29 and enter a verdict of acquittal; or alternatively, pursuant to Federal Rule of Criminal Procedure 33 setting aside the jury's guilty verdict and ordering a new trial. (Docs. 105, 106 and 118).

Based upon the parties' written submissions and for the reasons set forth below, Defendants' motions are DENIED.

## BACKGROUND

I.     Procedural History

On August 8, 2023, a grand jury sitting in the Southern District of New York returned an Indictment in this case against Jamie Orsini. (Doc. 22). The grand jury thereafter on January 9, 2024 returned Superseding Indictment S1 23 Cr. 402 (the "Indictment") charging Jamie Orsini and Nicholas Orsini with two counts: (1) carjacking resulting in the death of Steven Kraft, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2119(3) and 2 ("Count One"); and (2) conspiracy to commit carjacking, in violation of 18 U.S.C. § 371 ("Count Two"). (Doc. 38).

On January 19, 2024, the Court denied Defendant Jamie Orsini's motion to dismiss the Indictment. (Doc. 45). The Court's Pretrial and Motion Scheduling Order directed the parties to,

inter alia, meet and confer and agree, to the extent possible, on proposed *voir dire*, requests to charge, and a proposed verdict sheet. (Doc. 62). The parties submitted their joint pretrial filings on August 9, 2024. (Doc. 76, Doc. 77). The parties were in full agreement as to the proposed requests to charge except for Request Nos. 8, 10 and 11 with respect to the elements of the carjacking resulting in death statute. (Transcript of Sept. 3, 2024 Proceeding ("Sept. 3, 2024 Tr.," Doc. 135) at 9). At the final pretrial conference on September 3, 2024, the Court stated that the Government's theory of the case premised on the Defendants' alleged unconditional intent was viable under Second Circuit precedent. (*Id.* at 10). Therefore, the Court ruled that it would charge the jury on the Government's theory of unconditional intent using its proposed jury instructions 8, 10 and 11 if the Government adduced proof at trial on this theory. (*Id.* at 11).

After *voir dire* and jury selection on September 17, 2024, the Court heard witness testimony and received evidence over the course of the eight-day trial. (*See generally* Trial Transcript, "Tr."). The Government called more than thirty witnesses in its case-in-chief. The Defendants did not offer any evidence after the Government rested.

The Court held a charging conference on September 26, 2024. After ruling that it would use the Government's proposed language for instructions 8, 10 and 11 as the government adduced proof with respect to the unconditional theory of intent regarding Section 2119 (Tr. 1185), the Court charged the jury on the same date. Defendants objected to the portion of the Charge (Instructions 8, 10 and 11) concerning § 2119(3) in Count One of the Indictment. The jury retired to deliberate on September 26, 2024, and on September 27, 2024, returned a verdict convicting Jamie Orsini and Nicholas Orsini of Count One (carjacking resulting in death) and Count Two (conspiracy). (*See* Sept. 27, 2024 Min. Entry). With respect to Count One, the jury found that death resulted from the carjacking.

On October 8, 2024, Nicholas Orsini and Jamie Orsini filed notices of their respective post-trial motions. (Doc. 105 and Doc. 106).[1] On December 13, 2024, Nicholas Orsini and Jamie Orsini each filed a memorandum of law in support of their post-trial motions. (Doc. 119 and Doc. 120).[2] On March 22, 2025, the Government opposed the motions. (Doc. 130). On May 12, 2025, Jamie Orsini filed a reply with the Court's permission. (Doc. 133).[3]

II.    Summary of the Evidence Adduced at Trial

Jamie Orsini and Kraft were married from December 9, 2005, to May 22, 2012 and they had two daughters who were born in 2007 and 2009 respectively. (GX 1001 ¶ 1). In 2007, Kraft went AWOL from the military for approximately four years and Kraft's father did not have contact with him during any of Kraft's leave. (GX 1006 ¶¶ 3–5). On July 3, 2012, Jamie and Nicholas Orsini were married and they remain married today with two children of their own. (GX 1001 ¶ 2).

During 2020, Jamie Orsini had primary custody of her daughters with Kraft, and Kraft had authorized visitation every Tuesday from 4:00 p.m. through 7:00 p.m. and every other Saturday from 12:00 pm through 3:00 pm. (GX 1001 ¶ 3). During April and May 2020, the Orsinis and all four of Jamie's children -- the two daughters she had with Kraft and the two sons she had with Nicholas -- lived in the rear apartment of 10 West Church Street, in Beacon, New York. (GX 1001 ¶ 4).

On March 5, 2020, Kraft filed a *pro se* request for a modification of the custody arrangements previously ordered in New York family court, specifically proposing "that [he]

---

[1] On December 13, 2024, Nicholas Orsini filed a second Notice of Motion. (Doc. 118).

[2] On December 13, 2024, Defendants also requested permission to join in the other Defendant's post-trial motions. (Doc. 121). Therefore, to the extent applicable, the Court will consider the arguments advanced in one defendant's motion papers as applying to the other defendant.

[3] On March 24, 2025, new counsel was appointed for Jamie Orsini. (*See* Mar. 24, 2025 Min. Entry).

should have physical custody or that [he] should have 50/50 with having the girls on every Tuesday along with the 1st, 3rd, 4th weekend of every month + have 3 weeks of summer vacation; or that [he] be allowed to move back to Illinois + have my kids every summer + winter break also with current time of the year to see them." (GX 1001 ¶ 5). A court scheduled a hearing for June 10, 2020 to determine whether to modify the custody and visitation order regarding Jamie Orsini and Kraft's daughters. (GX 1001 ¶ 6).

On April 26, 2020, the Orsinis drove to Home Depot in Fishkill, New York. (GX 175-B1, 921 at 3, 1001, 1002 ¶ 2, 1003 ¶ 10(f)). Jamie Orsini bought 1,000 square feet of plastic sheeting, a painter's coverall, disposable shoe covers, and heavy-duty duct tape that Nicholas Orsini helped place in their truck. (GX 1, 171, 174-B1, 175-B2, 921 at 4-5, 1003 ¶¶ 10(b), (d) and (e); Tr. at 126, 247). After leaving Home Depot, the Orsinis drove to the corner of Carpenter Avenue and Third Street, at the entrance of Downing Park in Newburgh, New York, before driving back home. (GX 54, 55, 141-A, 142-A, 143-A, 144-A, 201, 901 at 12-13, 921 at 6-12, 16-17, 1003 ¶ 6). Several hours later on the same day, Jamie Orsini and Kraft's older daughter's cellphone traveled the same route to the corner of Carpenter Avenue and Third Street and back to the Orsinis' residence, as Nicholas and Jamie Orsini had driven earlier that day. (GX 901 at 14–15; Tr. at 891). The following day, on April 27, 2020, Nicholas Orsini bought a disposable, pre-paid phone ending in 7755 and a $35 data plan at Walmart. (GX 261, 261-A & B, 901 at 16, 1003 ¶ 12(b); Tr. at 204-09, 222, 226).

On Tuesday, April 28, 2020, Kraft worked his normal shift at Frank's Deli from approximately 8:00 a.m. to 2:00 p.m. (Tr. at 42-43). At approximately 4:00 p.m., Kraft went to the Orsinis' home in Beacon, as he did every other Tuesday, picked up his daughters, drove to Sonic in Newburgh where he ordered food at the drive-thru, and then drove to his residence. (GX 231, 233-B1, 360-9, 501-T, 901 at 17 & 19, 921 at 32-33, 1002, 1003 ¶ at 13). Shortly thereafter, the

4

Orsinis also ordered food at the same Sonic drive-thru. (GX 232, 234-A1, 234-B1, 901 at 18, 921 at 34–36, 1003 at ¶ 13). Thereafter, the Orsinis drove to a Dunkin' Donuts in Newburgh, activated the disposable phone they purchased at Walmart, and drove home to Beacon. (GX 151-A, 703-J, 703-N, 723-A, 901 at 20, 921 at 37-39; Tr. at 746-47, 899). On the evening of April 28, 2020, Nicholas Orsini also failed to report to work. (GX 258-A).

Kraft dropped off his daughters at the Orsinis' home in Beacon around 7:00 p.m. consistent with the visitation schedule. (GX 501, 510-A, 901 at 21 & 23; Tr. at 901). At this time, Kraft had two phones: a Samsung J3 and a Samsung S10. (GX 913). Jamie Orsini informed the Town of Marlboro Police Department that she only knew that Kraft had the Samsung S10 phone. (GX 501).

From 7:00 p.m. to 8:44 p.m., Kraft's S10 phone, Nicholas Orsini's phone and Jamie Orsini's phone were at the Orsinis' home. (GX 901 at 23; Tr. 905-08). At 8:10 p.m., Nicholas Orsini texted his work colleague that his wife's car broke down in Harriman and he was putting his baby to sleep so he could not report to work until the next day. (GX 259-B, 921 at 49). No one, including Kraft's father, boss, landlord and co-workers, has seen or heard from Kraft since April 28, 2020. (GX 1006 ¶ 8; Tr. at 42, 49, 58, 342).

At approximately 8:44 p.m., Kraft's car left the Orsinis' residence and drove the same route to the corner of Carpenter Avenue and Third Street in Newburgh that the Orsinis had driven twice on April 26, 2020. (GX 121, 901 at 24–25, 921 at 52–64, 1003 at ¶ 3; Tr. at 911-12). At approximately 9:00 p.m., Kraft's car was left in front of a fire hydrant at the corner of Carpenter Avenue and Third Street where it would later be found by the police. (GX 302-A, 302-B, 901 at 24-25, 921 at 156; Tr. 63, 70). The police also found Kraft's J3 phone in the car's console. (Tr. 69-70). The police investigation later determined that Nicholas Orsini was the last person to drive Kraft's car. (Tr. at 341-42). The area around Carpenter Avenue and Third Street and Downing

Park was known as a high crime area where drug dealing occurred. (Tr. at 601, 608, 627). Neither Nicholas Orsini nor Jamie Orsini's DNA, fingerprints or hair samples were found inside Kraft's car. (Tr. at 304, 323, 336).

At 9:02 p.m., video surveillance showed an individual walking north on Robinson Avenue with Kraft's S10 phone, passing Youngest Brother Italian Restaurant. (GX 281, 901 at 25, 921 at 65–66, 1003 at ¶¶ 19-20; Tr, at 912). After passing Youngest Brother Italian Restaurant at 9:14 p.m., Kraft's S10 phone stopped working. (GX 901 at 25; Tr. at 912). The individual continued walking and entered a Sunoco gas station. (GX 241-A, 241-B, 921 at 67–71, 1003 at ¶ 15). Video surveillance showed the individual wearing a Jets jersey with stripes on the sleeves, a Levi's Stadium hat, a patterned blue bandana, and blue latex gloves. (GX 241-C, 241-D, 241-E, 241-E1, 921 at 72, 1003 at ¶ 15). Nicholas Orsini owned a similar Jets jersey and the police later found a Levi's Stadium hat and patterned blue bandana at the Orsinis' home. (GX 320-18-20, 921 at 73, 179; Tr. at 407–08, 546).

At 9:28 p.m., the disposable phone ending in 7755 was used to call All Family Taxi. (GX 703-J, 911-A, 921 at 69; Tr. at 913). The taxi left the Sunoco station at 9:39 p.m. and arrived near the Orsinis' home around 9:50 p.m. (GX 126, 242-C, 921 at 76–77). Nicholas Orsini's phone was at his residence the entire time between 8:45 p.m. and 11:51 p.m. (GX 901 at 27; Tr. at 914). During this time, the phone was used to text Nicholas Orsini's mother at 9:39 p.m. (GX 16-I, 911-A, 921 at 78; Tr. 432, 444). At 9:47 p.m., Jamie Orsini also sent two text messages to Nicholas Orsini's phone. (GX 921 at 88; Tr. 432, 442–43).

On April 29, 2020, the Orsinis purchased another disposable phone and then drove on three separate occasions to Amsterdam, New York where Nicholas Orsini grew up on a 100-acre plot of land owned by his mother and other relatives. (GX 111-A, 704-D, 704-L, 901 at 28, 34, 47-48,

921 at 102-103, 166-174, 1003 at ¶ 2, 1004 at ¶ 2; Tr. at 915, 925, 929, 938-39). The Orsinis only brought the disposable phone and did not bring their cell phones with them on these three trips to Amsterdam. (Tr. at 917, 925, 939). Nicholas Orsini only visited his mother on the third trip to Amsterdam. (GX 1004 at ¶ 6).

On May 2, 2020, Nicholas Orsini texted his mother asking if she told anyone he was coming to Amsterdam. (GX 16-G, 911-A, Tr. at 442). Nicholas Orsini then searched for "orange county ny news," "montgomery county ny news," and whether galvanized steel was burn proof. (GX 811-P2 & P3, 921 at 136, 138; Tr. at 796). The Orsinis then drove to Home Depot and bought two 31-gallon galvanized steel trash cans, three bottles of lighter fluid, two metal grates, a lighter, four steel rods, an angle grinder with five metal grinding disks, and a hole saw. (GX 172, 901 at 40-41, 921 at 140-46, 1003 at ¶ 10). On May 3, 2020, Nicholas Orsini also bought 16 bundles of firewood at Home Depot. (GX 173, 901 at 42, 921 at 148-51, 1003 at ¶ 10).

One of the Orsinis' neighbors testified that in the Spring of 2020 a "foul-smelling smoke started com[ing] through the windows" and "it smelled like a substance that shouldn't be burned, like chemicals." (Tr. at 165-166). Another neighbor testified that in the late spring or early summer of 2020, there was an "acrid, awful smoke smell coming into the apartment" from two large bins or drums exuding dark smoke from the Orsinis' backyard that was being attended to by Nicholas Orsini. (Tr. at 188-90). The neighbors also testified that they did not witness any arguments or fighting at the Orsini residence. (Tr. at 170, 173, 196).

On May 4, 2020, the Town of Marlborough Police Department found Kraft's car on Carpenter Avenue and Third Street in Newburgh. (Tr. at 63-64). On May 7, 2020, the Orsinis traveled to within two blocks of the Kraft vehicle on Carpenter Avenue and Third Street. (GX 901

at 45; Tr. at 936-37). The Orsinis did not stop at this location but proceeded home. (GX 901 at 45-46; Tr. at 938). The police did not inform the Orsinis where they found Kraft's car. (Tr. at 532).

## STANDARD OF REVIEW

I.    Federal Rule of Criminal Procedure 29

Federal Rule of Criminal Procedure 29(a) directs the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "[A] district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Berry*, No. 20-CR-00084, 2022 WL 1515397, at *3 (S.D.N.Y. May 13, 2022) (Nathan, J.).[4] Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).

The Court, when assessing the sufficiency of the evidence supporting a guilty verdict, "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). Therefore, a defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial "bears a heavy burden" when bringing a Rule 29(a) motion. *Id.* "[T]he evidence must be viewed in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), "since one fact may gain color from others," *Berry*, 2022 WL

---

[4] Unless otherwise noted, all case quotations omit internal quotation marks, citations, alterations, and footnotes.

1515397, at *3. This is an "exceedingly deferential standard of review." *United States v. Pica*, 692 F.3d 79, 86 (2d Cir. 2012).

II.       Federal Rule of Criminal Procedure 33

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." *United States v. Phillips*, No. 22-CR-00138, 2024 WL 1300269, at *3 (S.D.N.Y. Mar. 27, 2024) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)). "[M]otions for a new trial are disfavored in this Circuit." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995). "The defendant bears the burden of proving that he [or she] is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). Accordingly, "the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation, keeping in mind that the ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021).

**ANALYSIS**

Defendants make four arguments in support of their post-trial motions: (1) there was insufficient evidence for a reasonable jury to convict them; (2) the Court erred in admitting into evidence the items Defendants purchased at Home Depot and Walmart and in permitting two of their neighbors to testify; (3) the Court incorrectly instructed the jury regarding the required nexus

between the Defendants' murder of Kraft and the taking of his car; and (4) the federal carjacking statute, 18 U.S.C. § 2119, is unconstitutionally vague as applied to Defendants. (*See* Docs. 119, 120 and 133). The Court analyzes each of Defendants' arguments *seriatim*.

I.      Rule 29: Sufficiency of the Evidence

Defendants argue that the evidence adduced at trial was insufficient for a reasonable jury to convict them of Counts One and Two of the Indictment. Count One of the Indictment charged the Orsinis with violating 18 U.S.C. §§ 2119(3) and 2 by committing a carjacking resulted in death, and aiding and abetting that crime. To establish a violation of Section 2119, the Government was required to prove beyond a reasonable doubt that: (1) the defendant took a motor vehicle from the person or presence of another, or aided and abetted the same; (2) the defendant took the vehicle by using force or violence or by acting in an intimidating manner, or aided and abetted the same; (3) at the precise moment that the defendant demanded or took control of the vehicle, he or she acted with intent to cause death or serious bodily harm, or aided and abetted the same; and (4) the motor vehicle had previously been transported, shipped, or received in interstate or foreign commerce. (Tr. at 1356). The jury also found the Government proved that but for the actions of the defendant, or those he or she aided and abetted, the victim would not have died. (Tr. at 1362). Count Two of the Indictment charged the Orsinis with violating 18 U.S.C. § 371 by participating in a conspiracy to commit a carjacking, in violation of 18 U.S.C. § 2119.

The evidence at trial supporting the jury's guilty verdict on Counts One and Two of the Indictment, viewed in the light most favorable to the Government, and drawing all reasonable inferences in favor of the Government, can be summarized as follows. On April 26, 2020, the Orsinis purchased at Home Depot plastic sheeting, a painter's coverall, disposable shoe covers, and heavy-duty duct tape. (GX 1, 171, 174-B1, 175-B-1 & B2, 921 at 3-5, 1001, 1002 ¶ 2, 1003

¶¶ 10(b), (d) and (e); Tr. at 126, 247). These materials could be used to avoid leaving any forensic evidence of a murder. After leaving Home Depot, the Orsinis drove to the corner of Carpenter Avenue and Third Street, at the entrance of Downing Park in Newburgh where Kraft's car was ultimately found, before driving back home. (GX 54, 55, 141-A, 142-A, 143-A, 144-A, 201, 901 at 12-13, 921 at 6-12, 16-17, 1003 ¶ 6). On the same day, Jamie Orsini and Kraft's older daughter's cellphone traveled the same route to the corner of Carpenter Avenue and Third Street and back to the Orsinis' residence, as Nicholas and Jamie Orsini had driven earlier that day. (GX 901 at 14–15; Tr. 891). The jury could infer from this evidence that the Orsinis were planning to move Kraft's car from outside their residence following his murder and wanted to make sure that their movements could not be tracked.

On April 28, 2020, Kraft picked up his daughters at the Orsinis' home in Beacon with his automobile and dropped them off around 7:00 p.m. consistent with his visitation schedule. (GX 501, 510-A, 901 at 21 & 23; Tr. at 901). From 7:00 p.m. to 8:44 p.m., Kraft's S10 phone, Nicholas Orsini's phone and Jamie Orsini's phone were at the Orsinis' home. (GX 901 at 23; Tr. 905-08). At 8:10 p.m., Nicholas Orsini falsely texted his work colleague that his wife's car broke down in Harriman and he was putting his baby to sleep so he could not report to work until the next day. (GX 259-B, 921 at 49). No one has seen or heard from Kraft since 7:00 p.m. on April 28, 2020. (GX 1006 ¶ 8; Tr. at 49, 58, 342). The jury could infer from the totality of the evidence that the Orsinis were the last individuals to see Kraft when he dropped off his daughters at their residence, they killed him at the residence, and at the moment they killed him, they took control of his car which was parked outside of their house.

At approximately 8:44 p.m., Nicholas Orsini drove Kraft's car from the Orsinis' residence to the corner of Carpenter Avenue and Third Street in Newburgh using the same route that the

11

Orsinis had previously driven twice before on April 26, 2020. (GX 121, 901 at 24–25, 921 at 52–64, 1003 at ¶ 3; Tr. at 911-12). The police investigation also determined that Nicholas Orsini was the last person to drive Kraft's car. (Tr. at 341-42). At approximately 9:00 p.m., Nicholas Orsini left Kraft's car at the corner of Carpenter Avenue and Third Street where the car would later be found by the police. (GX 302-A, 302-B, 901 at 24-25, 921 at 156; Tr. 63, 70).

At 9:02 p.m., video surveillance showed an individual walking north on Robinson Avenue with Kraft's S10 phone and ultimately entering a Sunoco gas station. (GX 901 at 25, 921 at 65–71, 1003 at ¶¶ 15, 19-20; Tr, at 912). The jury could infer that this individual was Nicholas Orsini because he drove Kraft's car to this location in Newburgh and he owned clothing similar to the clothing captured on video surveillance -- a Jets jersey with stripes on the sleeves, a Levi's Stadium hat, a patterned blue bandana, and blue latex gloves. (GX 241-C, 241-D, 241-E, 241-E1, 320-18-20; 921 at 72-73, 179; 1003 at ¶ 15; Tr. at 407–08, 546).

At 9:28 p.m., Nicholas Orsini used the disposable phone ending in 7755 to call All Family Taxi. (GX 703-J, 911-A, 921 at 69; Tr. at 913). The taxi left the Sunoco station at 9:39 p.m. and arrived near the Orsinis' home at 9:50 p.m. (GX 126, 242-C, 921 at 76–77). The jury could infer from this evidence that Nicholas Orsini drove Kraft's car to Downing Park in an attempt to conceal his involvement in Kraft's death and his own whereabouts that night. The jury could also infer that during the time period when Nicholas Orsini was in Newburgh with Kraft's car, Jamie Orsini texted Nicholas Orsini's mother using his phone which was still at their residence. She also texted Nicholas Orsini's phone that he should come into their room. (GX 921 at 78, 88; Tr. 432, 442-44, 914). The jury could infer from her conduct that she was trying to create an alibi for both of them to make it appear they were both home on the night of April 28, 2020 in a further attempt to conceal their involvement in Kraft's murder.

On April 29, 2020, the Orsinis purchased another disposable phone and then drove on three separate occasions with only the disposable phone to Amsterdam, New York where Nicholas Orsini was raised. (GX 111-A, 704-D, 704-L, 901 at 28, 34, 47-48, 921 at 102-103, 166-174, 1003 at ¶ 2, 1004 at ¶ 2; Tr. at 915, 917, 925, 929, 938-39). The jury could infer from this evidence that the Orsinis made these trips to hide evidence of Kraft's death.

On May 2 and 3, 2020, the Orsinis drove to Home Depot and bought two 31-gallon galvanized steel trash cans, three bottles of lighter fluid, two metal grates, a lighter, four steel rods, an angle grinder with five metal grinding disks, a saw and 16 bundles of firewood. (GX 172, 173, 901 at 40-42, 921 at 140-151, 1003 at ¶ 10). Two of the Orsinis' neighbors further testified that in the spring or early summer of 2020, there was a foul, acrid smoke smell coming from two large bins or drums exuding dark smoke from the Orsinis' backyard which were being attended to by Nicholas Orsini. (Tr. at 165-66, 188-90). The jury could infer from this evidence that the Orsinis burned evidence of their crime.

On May 7, 2020, after the New York State police interviewed Jamie Orsini and attempted to interview Nicholas Orsini in connection with Kraft's disappearance, the Orsinis traveled to within two blocks of the Kraft vehicle on Carpenter Avenue and Third Street. (GX 901 at 45; Tr. at 526, 542, 936-37). The Orsinis did not stop at this location but proceeded home. (GX 901 at 45-46; Tr. at 938). The police did not inform the Orsinis where they found Kraft's car. (Tr. at 532). The jury could infer from this evidence that the Orsinis wanted to see if Kraft's car was still where Nicholas Orsini left it now that the police were investigating his disappearance. The jury could also infer that the Orsinis could only have known the location of Kraft's car in Newburgh if Nicholas Orsini was the one who drove the car to this location that the Orsinis had previously scouted.

13

The Orsinis also made multiple misrepresentations regarding Kraft's disappearance that the jury could infer was their attempt to cover up Kraft's murder. Nicholas Orsini informed his supervisor that he did not report to work on the evening of April 28, 2020 because his wife's car broke down in Harriman and he was putting his baby to sleep. (GX 259-B, 921 at 49). However, the jury could infer that during the evening of April 28th Nicholas Orsini was in Newburgh dumping Kraft's car and Jamie Orsini was at home.

Jamie Orsini informed the police that Nicholas Orsini was home the entire night on April 28, 2020. (GX 510-M). As explained above, the jury could infer that this statement to law enforcement was false. Jamie Orsini also gave varying accounts of her interactions with Kraft on April 28th. On one occasion, Jamie Orsini told the police that she and Kraft were outside her home for about an hour after he dropped off their daughters. (GX 510-K). On another occasion, she informed the police that Kraft came into their home to discuss the children. (GX 510-A). Jamie Orsini later told the 10 West Church Street property manager that she never let Kraft inside the residence and on April 28th, he dropped off their daughters and left. (GX 514). Finally, on August 7, 2020, Jamie Orsini's phone searched "how long until missing persons cases become cold cases." (GX 921 at 181; Tr. at 412). The jury could infer that Jamie Orsini's deception and actions were designed to cover up her involvement in Kraft's murder.

Defendants argue that the government failed to offer evidence establishing when Kraft was killed and when he relinquished control of his car keys. Therefore, Defendants contend there was insufficient evidence that they intended to kill Kraft at the moment they took control of his car. Defendants cite *United States v. Applewhaite*, 195 F.3d 679 (3d Cir. 1999), to support their argument, but that case is distinguishable from the record here. As summarized by the Second Circuit in *United States v. Felder*, in *Applewhaite*, "no record evidence existed to show that, at the

14

moment he used force and violence against the victim, the defendant had any intention of taking the victim's car. Instead, the defendant used force and violence solely for the purpose of bludgeoning his victim; he took the vehicle as an afterthought in an attempt to get [the victim's] limp body away from the crime scene." 993 F.3d 57, 67 (2d Cir. 2021) (citing *Applewhaite*, 195 F.3d at 685-86). Here, however, there was sufficient evidence for the jury to conclude that the Orsinis intended to take Kraft's car at the moment they killed him and that the taking of Kraft's car was not merely an afterthought. The Orsinis meticulously planned the murder of Kraft knowing they would need to take control of his car at the moment they killed him because Kraft's car was going to be parked outside of their residence when he dropped off his daughters. The Orsinis knew prior to Kraft's murder that they would need to move his car from their residence so they planned for Nicholas Orsini to drive the car to Newburgh following Kraft's death.

Defendants also argue that the jury could have found competing inferences from the trial evidence. Namely, Kraft could have disappeared as he had done once before, he could have bought drugs and/or been killed in Newburgh, which is known as a crime and drug-infested area, and there was insufficient evidence that Nicholas or Jamie Orsini killed Kraft based on the lack of forensic evidence in Kraft's car and at the Orsinis' residence tying the Orsinis to his murder.

These arguments, however, "ignore[ ] the existence, and relevance of, the circumstantial evidence." *United States v. Varanese*, 417 F. App'x 52, 54 (2d Cir. 2011). "Even assuming that [the Orsinis] ha[ve] posited a plausible counter-interpretation of the evidence, the jury was not compelled to accept it where, as here, there was sufficient evidence to support the government's interpretation of the evidence." *United States v. Mason*, 479 F. App'x 397, 399 (2d Cir. 2012). It is the role of the jury, not the Court, to choose among competing inferences that can be drawn from the evidence. *See Varanese*, 417 F. App'x at 55.

15

Viewing the evidence in its totality, not in isolation, in the light most favorable to the government, and crediting every inference that could have been drawn in the government's favor, the evidence introduced at trial cannot be said to have been insufficient to support the jury's guilty verdict on Counts One and Two of the Indictment. Accordingly, Defendants' request to set aside the jury's guilty verdict and enter a verdict of acquittal is denied.

II.    Rule 33

A.    Admission of Home Depot and Walmart Evidence and Neighbor Testimony

Defendants argue that the Court improperly admitted into evidence items that the Orsinis purchased at Home Depot and Walmart around the time of Kraft's disappearance, including 1,000 square feet of plastic sheeting, a painter's coverall, disposable shoe covers, heavy-duty duct tape, two 31-gallon galvanized steel trash cans, three bottles of lighter fluid, two metal grates, a lighter, four steel rods, an angle grinder with five metal grinding disks, and a hole saw. (GX 1, 171, 172, 173, 174-B1, 175-B2, 1003 ¶ 10(b)). The Orsinis characterize these purchases as "standard household items" that were not connected to the alleged murder or coverup. (Doc. 120 at 15-17). The Orsinis also argue that they presented evidence that Nicholas Orsini purchased the painter's coverall, plastic sheeting and boots because the landlord asked him to paint the residence as partial payment for overdue rent. (Doc. 120 at 16). Finally, the Orsinis argue that the testimony of their two neighbors regarding the foul smell coming from two large bins in the Orsinis' backyard tended to by Nicholas Orsini was irrelevant and prejudicial because the Government did not adduce evidence that Nicholas Orsini was attempting to destroy evidence. (Doc. 120 at 17).

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence "need only tend to prove the government's case," such as

16

"evidence that adds context and dimension to the government's proof of the charges." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

The parties presented competing theories at trial regarding the significance of the items the Orsinis' purchased at Home Depot and Walmart and the testimony of the Orsinis' neighbors. The government argued that this evidence established that the Orsinis planned to murder Kraft, and that they disposed of the evidence and covered up the murder by not leaving any forensic evidence tying them to the murder. Conversely, Defendants argued that these were ordinary household items that could have been used for a barbecue or for painting and that this evidence was not connected to the murder. The evidence regarding the items purchased by the Orsinis around the time of Kraft's disappearance that could be used to plan and cover up his murder, and the testimony of the Orsinis' neighbors regarding the foul-smelling smoke emanating from their backyard, clearly had a tendency to prove that the Orsinis murdered or aided in the murder of Kraft. Further, the evidence had a tendency to show that the Orsinis used the items to dispose of the evidence and cover up the murder. *See United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) ("Nonconclusive evidence should still be admitted if it makes a proposition more probable than not; factors which make evidence less than conclusive affect only weight, not admissibility.").

Certainly, "any proof highly probative of guilt is prejudicial to the interests of that defendant." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995). However, "[t]he prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *Id.* (quoting *United States v. Figueroa*, 618

F.2d 934, 943 (2d Cir. 1980)). Defendants have not established any unfair prejudice resulting from the admission of evidence that the jury was free to credit or reject based on the parties' competing arguments.

Accordingly, Defendants' request for a new trial based on the improper admission of evidence is denied.

B. Jury Charge

Defendants argue that the Court erred in instructing the jury as to the elements of Count One of carjacking resulting in death. The statute states, in relevant part: "Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall[,] . . . if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death." 18 U.S.C. § 2119(3).

At the final pretrial conference, the Court ruled that the unconditional intent theory under the carjacking statute was viable as a matter of law such that "the intent to kill for any reason coupled with the taking of the car by use of force or violence" was sufficient to establish the *mens rea* requirement under the statute. (Sept. 3, 2024 Tr. at 11). Therefore, the Court held that it would charge the jury on the Government's theory of unconditional intent if the Government adduced proof of the theory at trial. (*Id.*).

At trial, the Court instructed the jury, consistent with the Government's proposed instructions, that to find each defendant guilty of carjacking, the Government had to prove each of the following elements beyond a reasonable doubt:

> First, that the defendant took a motor vehicle from the person or presence of another, or aided and abetted the same;

18

Second, that the defendant took the vehicle by using force or violence or by acting in an intimidating manner or aided and abetted the same;

Third, that at the precise moment that the defendant demanded or took control of the vehicle, he or she acted with intent to cause death or serious bodily harm, or aided and abetted the same; and

Fourth, that the motor vehicle had previously been transported, shipped, or received in interstate or foreign commerce.

Tr. at 1356. With respect to the third element, the Court further instructed the jury that "[t]o establish this element, the government must prove that at the precise moment the defendant or those he or she aided or abetted, demanded or took control of the vehicle, the defendant, or those he or she aided and abetted[,] possessed the intent to seriously harm or kill the driver for any reason. The carjacker's motive is not relevant." (Tr. at 1358-59).

Defendants object to the jury charge on the grounds that the jury was required to find a purposeful, rather than a temporal, nexus between the carjacking and the murder. (Doc. 120 at 18). Therefore, Defendants argue that the Court erred in failing to instruct the jury that: (1) with respect to the second element, the defendant was required to use force or violence in relation to the taking of the vehicle; and (2) with respect to the third element, that the defendant was required to act with intent to cause death or serious bodily harm in furtherance of taking the car, as opposed to the instruction that the intent to seriously harm or kill the driver could be for any reason. (Doc. 120 at 18).

The Court instructed the jury consistent with Second Circuit and Supreme Court precedent. In *United States v. Felder*, the Second Circuit affirmed the district court's jury instructions, which this Court adopted at trial, and held that "the district court correctly instructed the jury that to prove the *mens rea* element of carjacking in violation of § 2119, the government was obliged to prove that at the moment the vehicles in question were demanded or taken by force and violence or intimidation, [the defendant] possessed the intent to seriously harm or kill the driver if necessary

19

to steal the car or for any other reason." 993 F.3d at 68. The Second Circuit further noted that the viability of an unconditional intent theory was supported by the statutory text and "compelled by the United States Supreme Court's decision in *Holloway v. United States*, 526 U.S. 1 (1999)." *Id.* at 65.[5]

Defendants argue that their requested jury instructions were based on decisions by the Third Circuit in *United States v. Applewhaite* and the Fifth Circuit in *United States v. Harris*, 420 F.3d 467 (5th Cir. 2005). However, the Second Circuit distinguished these out-of-Circuit cases in upholding the jury instructions adopted by this Court. *See Felder*, 993 F.3d at 66-67. Therefore, similar to *Felder*, Defendants cannot "argue that the jury here was not properly charged on the need for the government to prove that [they] possessed the requisite murderous or injurious intent at the moment" of the carjacking. *Id.* at 67.

Accordingly, Defendants' request for a new trial based on improper jury instructions is denied.

C.  Vagueness Challenge

Defendants argue that the carjacking statute as applied to them is unconstitutionally vague under the Fifth Amendment Due Process Clause because there was no fixed standard for the Court and jury to decide what conduct constitutes carjacking. Defendants further contend that the statute does not provide fair notice that their conduct violated the statute because Kraft's vehicle was

---

[5] The Second Circuit also commented that the Sand model federal jury instructions most frequently used in this circuit adopt *Holloway's* unconditional intent to do harm language. *Felder*, 993 F.3d at 66 n.5; *see also United States v. Perry*, 381 F. App'x 252, 254 (4th Cir. 2010) ("[A] defendant who possesses the intent to kill or seriously harm the driver of a vehicle may be convicted of carjacking, even if his intent to harm is unrelated to the carjacking, so long as his intent is formed when he takes control of the vehicle and he satisfies § 2119's other elements.").

taken after the violence was completed and without confrontation over the vehicle. (Doc. 120 at 21, Doc. 133 at 1).

"A criminal statute is void for vagueness if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Concepcion*, 139 F.4th 242, 248 (2d Cir. 2025). "Therefore, to survive a vagueness challenge, a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Houter*, 980 F.3d 268, 273 (2d Cir. 2020) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

The inquiry in an as-applied vagueness challenge starts with the statutory text as courts must analyze "whether the statute's language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding." *Houter*, 980 F.3d at 275. Vagueness concerns regarding a statute's lack of fair notice are also ameliorated where the statute contains a scienter requirement. *See United States v. Scott*, 979 F.3d 986, 993 (2d Cir. 2020) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

The carjacking statute provides, in relevant part, that: "Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle . . . from the person or presence of another by force and violence or by intimidation, or attempts to do so" violates the statute and commits a crime. 18 U.S.C. § 2119. The jury determined that Defendants intended to and did kill Kraft and then took his car by force and violence. Although Defendants contend the facts of the case are not a classic carjacking scenario, the statute provided them fair notice that intending to kill Kraft and taking his car by force in the process violated the statute. Moreover, the specific intent requirement set forth in the statute alleviates any concerns regarding vagueness and fair notice. *See Scott*, 979

21

F.3d at 993; *see also United States v. Allen*, 127 F.3d 260, 264 (2d Cir. 1997) ("The sufficiency of the evidence to satisfy the scienter requirement in a particular case is a threshold issue that obviates a vagueness challenge."). The statute is not unconstitutionally vague.

Defendants also argue that the carjacking statute is vague as applied to them because none of the cases relied on by the Government involved a similar fact pattern to this case. (Doc. 120 at 21). However, because a vagueness challenge depends primarily on the text of the statute, reference to comparable cases is of limited relevance. *See Houter*, 980 F.3d at 276.

"A statute is also void for vagueness if it has standardless wording that allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.* at 276. Although Defendants do not focus their vagueness argument *in haec verba* on this ground, a court "can uphold the statute on two alternate grounds: (1) that [the] statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement or (2) that, even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *Id.* at 277 (quoting *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006)).

The Court has already determined that Defendants' conduct falls within the core of the statute's prohibition because at the moment they killed Kraft, they took control of his car that was parked outside of their residence as they had planned. Therefore, the carjacking statute is not vague as applied to Defendants.

Accordingly, Defendants' motions under Rules 29 and 33 for an order setting aside the jury's guilty verdict and entering a verdict of acquittal or ordering a new trial are denied.

## CONCLUSION

For the foregoing reasons, Defendants' post-trial motions are DENIED. The Court will direct that the Probation Department conduct a presentence investigation and prepare a Presentence Report for each Defendant. Jamie Orsini's sentencing is scheduled for June 16, 2026 at 2:30 p.m. in Courtroom 520. Jamie Orsini's sentencing submission is due 3 weeks prior to sentencing, by May 26, 2026, and the Government's submission is due 2 weeks prior to sentencing, by June 2, 2026. Nicholas Orsini's sentencing is scheduled for June 18, 2026 at 2:30 p.m. in Courtroom 520. Nicholas Orsini's sentencing submission is due 3 weeks prior to sentencing, by May 28, 2026, and the Government's submission is due 2 weeks prior to sentencing, by June 4, 2026.

The Clerk of Court is respectfully directed to terminate the pending motions: Docs. 103, 105, 106, 118 and 121.

**SO ORDERED.**

Dated: White Plains, New York
   January 23, 2026

_____
Philip M. Halpern
United States District Judge

23